IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

BRIAN H.,[1]                          )
   Plaintiff,          ) Case No. 5:19-cv-00029
              )
v.                                    ) REPORT & RECOMMENDATION
              )
ANDREW M. SAUL,                       ) By: Joel C. Hoppe
Commissioner of Social Security       )   United States Magistrate Judge
   Defendant.[2]        )

   Plaintiff Brian H. asks this Court to review the Commissioner of Social Security's final

decision denying his application for disability insurance benefits ("DIB") under Title II of the

Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C.

§ 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the

applicable law, I find that substantial evidence supports the Commissioner's denial of benefits.

Accordingly, I respectfully recommend that the presiding District Judge affirm the decision.

I. Standard of Review

   The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Commissioner Saul is hereby substituted for the former Acting Commissioner of Social Security, Nancy
A. Berryhill, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Brian applied for DIB in November 2013, alleging disability because of sleep apnea, severe depressive disorder, chronic pain, and migraines. Administrative Record ("R.") 72, 164–65, ECF No. 7. Brian was forty-three years old, or a "younger person" under the regulations, when he allegedly became disabled on November 1, 2013. R. 72; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied his application initially in November 2015, R. 72–83, and upon reconsideration in April 2016, R. 84–96. In September 2017, Brian appeared with counsel and testified at an administrative hearing before ALJ H. Munday. R. 44–64. A vocational expert ("VE") also testified. R. 64–71. At the hearing, Brian amended his alleged disability-onset date to December 4, 2014. R. 48.

ALJ Munday issued an unfavorable decision on February 12, 2018. R. 15–30. Brian had severe impairments of "degenerative disc disease of the cervical, thoracic, and lumbar spine, fibromyalgia, chronic pain, migraines and occipital neuralgia, obstructive sleep apnea, depression, and generalized anxiety disorder." R. 18–19. Brian's other impairments, including obesity, hypertension, hyperuricemia, and osteoarthritis, were non-severe because they did "not

cause . . . significant limitations in his ability to perform basic work-related functions." R. 19, 20 (punctuation corrected). Brian's severe degenerative disc disease did not meet or equal Listing 1.04 because his MRIs showed no evidence of compromised nerve root or spinal cord with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." R. 20 (citing R. 337–38; 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04). His mental health impairments did not meet or equal the relevant Listings because he had "moderate" overall limitations understanding, remembering, and applying information and interacting with others, and "mild" overall limitations concentrating, persisting, and maintaining pace, and adapting or managing himself. R. 20–21 (citing R. 214–25, 1035, 1144, 1215–16, 1277, 1286, 1297, 1316, 1321, 1968–69, 1979, 1987, 1990, 1999–2000, 2010, 2022–23, 2033–34, 2068, 2075, 2127, 2145–46, 2918; 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06). ALJ Munday also determined that Brian's sleep apnea, chronic pain, migraines, occipital neuralgia, and fibromyalgia did not medically equal a Listing. R. 20.

ALJ Munday then evaluated Brian's residual functional capacity ("RFC") and determined that he could perform light work[4] with additional limitations: he could occasionally balance, stoop, and climb ladders, ropes, and scaffolds; frequently handle with his right upper extremity; tolerate moderate intensity noise levels, frequent exposure to extreme cold, wetness, and pulmonary irritants, and occasional exposure to vibrations and workplace hazards; and perform simple routine tasks with occasional interaction with the general public and coworkers. R. 21.

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

Based on this RFC finding and the VE's testimony, ALJ Munday concluded that Brian could not perform his past relevant work as a systems engineer, but he could transition to less demanding light, unskilled occupations (office helper, mail room clerk, stock clerk) that offered a significant number of jobs in the national economy. R. 28–29, *see* R. 66–67.

The Appeals Council denied Brian's request for review, R. 1–3, thereby making ALJ Munday's written decision "the final decision of the Commissioner," R. 1. This appeal followed.

## III. Discussion

Brian argues that the ALJ erred in evaluating the opinions of his treating physicians regarding his mental health. Pl.'s Br. 4–30, ECF No. 11. He also argues that the ALJ considered his headaches "severe," but failed to accommodate his resulting limitations in the RFC. *Id.* at 30–37. Finally, Brian argues that the ALJ's credibility assessment was deficient because she failed to consider his strong work history. *Id.* at 38–40. His arguments are not persuasive.

### A.    Summary

#### 1.    Treatment Notes

Brian has a history of headaches and migraines, depression, anxiety, chronic pain, and sleep apnea. His headaches began at age forty-one. *See* R. 727, 1474. Prior to Brian's amended alleged disability-onset date, he regularly reported to various providers that he had headaches. R. 295, 298, 385, 432, 434, 443, 494, 512, 725, 927, 1507, 1633. A head CT scan in November 2012 was normal. R. 321. His headaches were sometimes intermittent, R. 502, 1327, but often occurred daily, R. 295, 385, 443, 719, 1474. Brian also reported that he experienced migraines ranging from twice a week to four to five times a month. R. 299, 371. Situational stress, bright lights, loud noise, fatigue, crowds, cold weather, odors, and smoke triggered and exacerbated his headaches. R. 379, 443, 727, 1327, 1475. His headaches caused a dull, aching, throbbing, sharp,

or pounding pain; memory problems; confusion; and phonophobia. R. 295, 375, 379, 444, 502, 727, 1474, 1507, 1633. He also occasionally missed work because of his headaches. *See* R. 727, 1474.

Between October and December 2013, Glenn Deputy, M.D., treated Brian's headaches with nerve blocks and trigger point injections. R. 540, 547, 552. Brian initially reported that the injections helped his pain, R. 540, 547, 1637, but later reported that he received no lasting benefit, R. 295, 299, 1327, 1633. Brian's providers also prescribed various pain medications, including Topamax, Gabapentin, Oxycodone, Nucynta, Opana Extended Release ("Opana ER"), Nortriptyline, Lyrica, Maxalt-MLT, and Tramadol.[5] R. 300, 311, 436, 720, 723, 726, 729, 1476, 1536; *see also* R. 299, 547. Brian reported that Tramadol, Opana ER, and Oxycodone helped his pain, R. 295, 299, 443, 1633; *see also* R. 725, 926 (reporting significant improvement), but Lyrica did not, R. 299, 547. He occasionally reported side effects, including irritability, fatigue, dysphagia, and constipation. R. 432, 719, 725, 927, 1644.

An MRI of Brian's head in December 2013 was normal except for a mucous retention cyst in his right maxillary sinus. R. 602. Brian's mental and physical exams were mostly normal, *see, e.g.*, R. 494–95, 503–04, 723, 728, 927–28, except for one instance in January 2014, when he had diffuse tenderness in his head, R. 728.[6] In January 2014, Mark Landrio, M.D., diagnosed Brian with muscle contraction tension-type headaches compounded by moderately severe

---

[5] These medications were also prescribed for Brian's reports of back and neck pain. *See, e.g.*, R. 296, 308, 311 385, 429, 432, 451, 724, 725, 928, 1112, 1327, 1636, 1643.

[6] Brian also had occasional instances of paraspinal tenderness and painful range of motion. R. 450, 1328. X-rays and an MRI in February 2014 showed mild degenerative changes in the cervical, thoracic, and lumbar regions of Brian's spine. R. 337–38, 594–96. An electromyography and nerve conduction test in May was normal. R. 315–19, 1429.

obstructive sleep apnea.[7] R. 299; *see also* R. 311 (Stacy Konyar, FNP, noting that Brian's headaches were due in part to his sleep apnea). Dr. Landrio also cautioned Brian "regarding rebound headaches when taking analgesics on a standing basis." R. 300. Brian's primary care physician, David Switzer, M.D., assessed possible fibromyalgia and recommended Brian see a rheumatologist and specialists for his headaches and other pain. R. 1633. In February, Brian's neurologist, Stuart Stark, M.D., assessed Brian with "[c]hronic daily headache associated with probable medication over-usage" and sleep disorder. R. 729.

Brian also complained of depression and anxiety prior to his amended alleged onset date. R. 296, 308, 438, 719, 728, 1110, 1118, 1126, 1134, 1141. Dr. Switzer initially treated Brian's symptoms with Paxil, Ativan, Viibryd, Xanax, Wellbutrin, and Trazodone. R. 385, 432, 436, 440, 446. Brian's mental exams were normal. R. 296, 299, 446, 457, 494–95, 503–04, 723, 728, 1328. In June 2014, Brian began treatment with Thomas Cardwell, M.D. R. 1109–14. In addition to depression and anxiety, Brian reported sluggish thinking, difficulty concentrating, and memory problems. R. 512, 1110, 1118, 1126, 1135, 1141. Brian's mental exams were normal except for a sad, anxious, or depressed mood and a constricted affect. R. 1113, 1120–21, 1128, 1136–37, 1144; *see also* R. 719. Dr. Cardwell prescribed Ritalin, Wellbutrin, and Cymbalta, and recommended that Brian attend psychotherapy. R. 1129, 1138, 1145.

Turning to the evidence from after Brian's alleged disability onset date, the record does not show that he received further treatment for his sleep apnea. He reported improvement in his symptoms, R. 1193, 1203, 1212, and his providers assessed central sleep apnea attributed to

---

[7] Brian had several polysomnograms done between 2012 and 2014 that confirmed his diagnosis of obstructive sleep apnea. R. 272, 285–86, 301, 517, 521, 1622. He was often fatigued, had difficulty falling and staying asleep, and did not wake refreshed. R. 295, 311, 371, 412–13, 431, 435, 438, 445, 494, 512, 725, 728, 1110, 1126, 1135, 1141 1507. His January 2014 polysomnogram demonstrated "near complete resolution of the obstructive events," R. 301, but Brian regularly reported trouble with his masks and equipment, R. 290–91, 295, 725, 926–27, 1506.

narcotic analgesics, R. 715, 1010. Brian also experienced improvement in his headaches. He reported regularly having headaches, *see, e.g.*, R. 538, 1035, 1205, 1744, 1968, 1999, 2009, 2033, 2055, 2089, 2120, 2926, that at times were occasional, R. 1239, 1968. He denied debilitating headaches. R. 714, 1009, 2924. His providers prescribed Opana ER, Oxycodone, and Haldol, and he received nerve blocks, R. 537–38, 718, 1010, 1056, 1286, 1293, 1321, all of which provided some pain relief, R. 733, 1317, 1319, 1744. On exam, Brian had no objective findings related to his headaches except for one instance of tenderness in his occipital region in January 2015. R. 538. Dr. Stark diagnosed Brian with "[c]hronic daily headache with possible [m]edication overuse headache." R. 715; *see also* R. 1056.

Brian also continued to report back, neck, and leg pain during the relevant time. R. 733, 1074, 1245, 1250, 1266, 1270, 1277, 1284, 1292, 1299, 1304, 1306, 1310, 1319, 1323, 2876. In April 2015, rheumatologist Don Martin, M.D., opined that it was unlikely Brian had fibromyalgia. R. 748. In April 2016, Wendy Burner, FNP, opined that his neck pain and headaches were caused by a disc bulge and osteophyte complex in his cervical spine resulting in occipital neuralgia. R. 1319, 1321. He started treatment with Alok Gopal, M.D., at the National Spine and Pain Center in June 2016. R. 1310–14. His physical exams were normal except for a slowed gait, occasional tenderness, positive straight leg raise and Spurling tests, restricted range of motion in his back, muscle spasms upon palpation, decreased strength in his right hand, and a taut band in his cervical spine. R. 733–34, 739, 745, 751, 1087, 1252, 1263, 1272, 1276–77, 1286, 1289, 1296–97, 1303–04, 1307, 1311, 1316, 1320–21, 1324. In November 2016, Dr. Gopal noted that Brian had "minimal disease in [his] cervical spine," R. 1282, and X-rays and an MRI in March 2017 showed only mild degenerative changes, R. 1333–34. Dr. Gopal recommended ECT as soon as possible because it "is the only thing which will change [Brian's]

8

depression and the associated pain with it—he is clearly chemically dependent as got very angry when I suggested no cause of pain." R. 1282. Brian's providers prescribed Opana ER, Oxycodone, Gabapentin, and Oxycontin, and administered medial branch nerve blocks. R. 1248, 1253, 1257, 1264, 1286, 1290, 1301, 1309, 1314. Brian reported that his medications, especially Oxycontin, helped his pain, R. 1284, 1288, 2052, 2064, 2089, 2096, 1302, 1306, and that his pain was controlled, R. 1268, 1997, 2031, 2041, 2075. Dr. Gopal and FNP Burner regularly noted that Brian had "continued analgesia and improvement in functionality" while on a "stable and relatively unchanging dose of [his] opiate medication[s]." R. 1255, 1260, 1266, 1270, 1275, 1280, 1284, 1288, 2876. Brian occasionally reported constipation, R. 714, 1010, 1310, 1319, but regularly reported no side effects from his medications, R. 1257, 1260, 1266, 1270, 1275, 1280, 1284, 1288.

Brian also continued to report depression and difficulty concentrating. R. 738, 1035, 1087, 1722. Brian's mental exams were normal except for a depressed or sad mood and a constricted or tense affect. R. 1150–51, 1157–58, 1166–67, 1176–77, 1186–87, 1195–96, 1205–06. Dr. Cardwell prescribed various combinations of Prozac, Fetzima, Lamictal, Lithium, Abilify, Xanax, Cymbalta, Provigil, and Ambien. R. 714, 1151, 1158–59, 1168, 1177, 1183, 1187, 1196–97, 1206–07. He also recommended TMS therapy, psychotherapy, and a Fisher Wallace stimulator. R. 1152, 1159, 1168, 1177, 1188, 1197, 1207. Brian experienced increased depression and confusion while taking Lamictal and Lithium. R. 1035, 1202. Abilify and the Fisher Wallace stimulator helped for a short time. *Compare* R. 714 *and* 1164, *with* R. 1035, 1173, *and* 1183. Cymbalta helped, *see* R. 1202, but Brian experienced significant side effects when Dr. Cardwell tried to wean him off it, R. 524–25, 714, 1156, 1164, 1173, 1193.

In October 2015, Brian was voluntarily admitted to the hospital because he twice overdosed on his medications. R. 1074–77. While in the hospital, he agreed to an opiate taper. R. 1077. He was discharged improved six days later with prescriptions for Klonopin, Wellbutrin, Hydroxyzine, and increased Cymbalta. R. 1072. He was told to stop taking Xanax, Abilify, Fetzima, Provigil, Oxycodone, and Ambien. *Id.* The hospital also recommended that he participate in the partial hospitalization program, but there is no indication in the records that he did. R. 2438.

Between October 2015 and June 2017, Brian reported that he experienced anxiety, depression, fatigue, sluggishness, lethargy, anger, and irritability and that he secluded himself in his house and often stayed in bed. R. 1222, 1236–37, 1252–53, 1268, 1272, 1276, 1286, 1293, 1297, 1300, 1307, 1310, 1319, 1324, 1965, 1976, 1987, 2007–08, 2020, 2041. His mental exams remained normal except for depressed and sad mood and constricted affect. R. 1215–16, 1224–25, 1239–40, 1968, 1979, 1990, 1999–2000, 2010, 2022–23, 2033–34, 2043–44, 2055, 2067–68, 2078–79, 2089-90, 2099–2100; *see also* R. 1277, 1286, 1290, 1297, 1304, 1316, 1321 (providers noting normal mental exams). Dr. Cardwell prescribed various combinations of Ambien, Wellbutrin, Effexor, Klonopin, Ativan, Adderall, Rexulti, and Zoloft. R. 1216–17, 1225–26, 1240, 1970, 1980, 1990, 2000, 2011, 2024, 2034, 2044, 2056, 2068, 2079, 2090, 2100. Brian also used Vitamin D, Androgel, and Provigil. R. 1055, 1987, 1997. Effexor, Rexulti, Adderall, and Androgel helped his symptoms, R. 1241, 1268, 1277, 1284, 1976, 2001, 2031, 2041, 2052, but Ativan did not help, R. 1976. Brian had to stop Rexulti and Adderall in May 2017 because of their costs. R. 2090. Dr. Cardwell continued to recommend psychotherapy, *see, e.g.*, R. 1217, 1266, 1980, 2001, 2024, 2056, 2080, 2101, and Dr. Cardwell and other providers strongly recommended he try electroconvulsive therapy ("ECT"), R. 1226, 1282, 1729, 2024, 2034, 2068,

10

2091. Brian consistently declined ECT, R. 1236, 1976, 1987, 2024, 2034, 2045, 2056, 2068,

2075, 2101, and requested ketamine infusion therapy, R. 1250, 1257, 2089.

In June 2017, Brian began therapy with Donna Van Horn, LCSW. R. 2107–10. He

reported anxiety and depression, difficulty concentrating, and secluding to his home and bed. R.

2107, 2109, 2117, 2127, 2145, 2918. Dr. Cardwell and Ms. Van Horn noted that Brian's mental

exams were normal except for a sad and depressed mood, constricted affect, and occasional poor

insight and judgment. R. 2109, 2120–21, 2137–38, 2146, 2918, 2926–27. Brian continued seeing

Dr. Cardwell, who prescribed Effexor, Zoloft, and Ambien, and recommended light box therapy.

R. 2121, 2139, 2927. Brian reported that Zoloft helped his symptoms, although he worried that it

might increase the frequency of his migraines. R. 2117, 2879. He also reported that

psychotherapy did not help, R. 2139, and he abruptly ended his therapy session in September, R.

2919. He continued to request ketamine infusion therapy. R. 1247, 2139, 2879, 2924.

   2.    *Medical Opinions*

In November 2014, Dr. Switzer opined "with a reasonable degree of certainty that [Brian

was] totally disabled by his neurological and psychiatric conditions," and he anticipated Brian's

disability would last longer than sixty days. R. 1761. In May 2015, Dr. Switzer similarly opined

"with a reasonable degree of certainty that [Brian was] disabled from working a job in the

national economy due to cognitive impairment related to chronic hypoxia" and his antidepressant

medications. R. 1722. Brian was also "limited by significant physical pain and extreme fatigue,"

and Dr. Switzer anticipated that his disability would last nine to twelve months. *Id.* In June, Dr.

Stark opined that Brian "[r]emain[ed] disabled from working in any capacity due to [his]

neurological condition." R. 1010. In December, Dr. Cardwell opined that there was "no debate

that [Brian had] been quite depressed and disabled by headaches and depressive symptoms for a number of years." R. 1227.

On initial review for the state agency in November 2015, Luc Vinh, M.D., opined that Brian's "mild-to-moderate" degenerative disc disease and associated pain limited him to occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, and sitting, standing, or walking for six hours. R. 79. David Deaver, Ph.D., opined that Brian's mental impairments caused mild restrictions in activities in daily living and mild difficulties in maintaining concentration, persistence, and pace, but no difficulties in maintaining social functioning and no repeated episodes of decompensation. R. 78. In April 2016, Gene Godwin, M.D., affirmed Dr. Vinh's physical RFC assessment, but added that Brian should also be limited to occasional stooping. R. 92–94. Howard Leizer, Ph.D., also affirmed Dr. Deaver's assessment of Brian's "non-severe" mental impairments. R. 90–91.

In June 2017, Dr. Cardwell opined that Brian was "severely impaired" because he had "failed many treatments"; he doubted that Brian could work. R. 2101. Dr. Cardwell also completed a mental impairment questionnaire. R. 1762–67. Brian had depression and severe generalized anxiety. R. 1762. He had been hospitalized four times during his life and tried many medication trials. *Id.* He was prescribed Zoloft, Wellbutrin, and Effexor and experienced no side effects. *Id.* The clinical findings that supported the severity of Brian's mental impairments and symptoms were "depression, [decreased] energy, lack of motivation." *Id.* Brian had "no useful ability to function" in maintaining regular attendance; he was "unable to meet competitive standards" in maintaining attention for two hours, sustaining an ordinary routine without special supervision, working in coordination with others without undue distraction, completing a normal workday or workweek without psychiatric interruptions, performing at a consistent pace, dealing

with normal work stress, setting realistic goals and planning independently, interacting appropriately with the general public, and understanding, remembering, and carrying out detailed instructions; and he was "seriously limited" in remembering work-like procedures, making simple work-related decisions, responding appropriately to workplace changes, and understanding, remembering, and carrying out simple instructions because he was "unable to function." R. 1764–65. Brian's psychiatric condition exacerbated his pain, but his migraines were stable. R. 1765. Brian had "extreme" limitations in applying information and managing himself; marked limitations in interacting with others, adapting in the workplace, and concentrating, persisting, and maintaining pace; and mild limitations in remembering information. R. 1766. Brian's disorders were "serious and persistent" requiring ongoing treatment to diminish his symptoms, and, despite his diminished symptoms, he had only marginal adjustment. *Id.* Brian would miss more than four days of work per month. *Id.* Brian was "severely impaired despite multiple efforts." R. 1767.

### 3.    *Brian's Statements*

In September 2015, Brian submitted a Function Report that his fiancé helped him complete. R. 214–225; *see* R. 195, 758. He "[m]ostly stay[ed] in the house all day" and stayed in bed. R. 215. He could not sleep because of sleep apnea and other illnesses. R. 216. He had no problems with personal care, but needed reminders to bathe and brush his teeth. R. 216–17. His fiancé or parents prepared meals and did the housework and yardwork. R. 217–18. He could drive, but he did not like to travel long distances because of his lack of sleep and medications. R. 218. He could shop, pay bills, count change, handle a savings account, and use a checkbook. *Id.* He liked to read, work on a computer, and watch football, but he did not do those activities often because he could not concentrate, and he got sleepy. R. 219. He had no problems getting along

13

with family, friends, or authority figures, but he did "not really have conversation[s]" with them, and he no longer participated in activities with his family. R. 220–21; *see also* R. 216. Brian's back and body hurt after lifting, squatting, bending, or standing for long periods, and reaching, walking, and sitting aggravated him. R. 220. He could walk half a mile before needing to rest, and he did not need an assistive device. R. 220–21. Depression and lack of sleep made it difficult to concentrate, remember, and complete tasks because he was very disoriented. R. 220. He could pay attention for only two to three minutes, he could not follow written or spoken instructions, and he did not finish what he started. *Id.*

In September 2017, Brian testified at an administrative hearing before ALJ Munday. R. 44–64. He stopped working in 2014 because he "started feeling down and bad and hurt and pain," and he could not maintain attendance. R. 49–50. Medications did not help his mental disorders, his anxiety worsened, and he was not comfortable being around others. R. 50. Brian's migraines occurred once a week, and when he experienced them, he had to go to a cool dark room and wear headphones to block out the noise. R. 51–52. He had nausea and vomiting for three out of four migraines. R. 51. He handled his migraines by taking oxycodone, which made him "foggy," and sleeping them off. R. 52–53. Brian did not tolerate the CPAP mask and was receiving no treatment for sleep apnea except that he took Ambien every night. R. 53–54. He slept for only two to four hours at a time, and he napped during the day. R. 54–55. He usually woke with a headache, was fatigued all day, and could do something for only ten minutes before feeling the urge to sleep. R. 55–56. He had stopped driving because of his chronic fatigue. R. 56.

Brian had chronic pain in his neck, legs, groin, shoulder, and right hand. R. 57–58. He hurt after standing for ten or fifteen minutes and could sit for only two hours at a time. R. 63. He received injections in his head and neck and took opiates for the pain that made him drowsy and

affected his ability to focus. R. 57–58. Even lifting small things hurt his back and shoulder. R.

63. He had injured his right (dominant) hand in a fall, and his strength was reduced to fifty

percent, he could not type or use a weed eater, and he could use a computer mouse only for a

short period. R. 59. Brian's depression made him feel "totally worthless, shameful, and

embarrassed." R. 60. He had lost his job and broken up with his fiancé, and he was not motivated

to get out of bed. *Id.* He left the house only for doctor visits, his dad did his grocery shopping,

and he did not take his children to ball games anymore. R. 61–62. He thought he would have

trouble dealing with a supervisor, and he had avoided his previous boss. R. 62.

B.      *The ALJ's Decision*

       ALJ Munday determined that Brian had severe impairments of degenerative disc disease

in his cervical, thoracic, and lumbar spine; fibromyalgia; chronic pain; migraines and occipital

neuralgia; obstructive sleep apnea; depression; and generalized anxiety disorder. R. 18. All other

impairments were non-severe because Brian received limited treatment and they did "not cause .

. . significant limitations in his ability to perform basic work-related functions." R. 19, 20

(punctuation corrected). His severe impairments did not meet or equal any relevant Listing. R.

20–21 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.04, 12.04, 12.06).

       Turning to the RFC assessment, ALJ Munday summarized Brian's testimony and his

treatment history. R. 22–26. She found that Brian's "medically determinable impairments could

reasonably be expected to cause [his] alleged symptoms," but that his "statements concerning the

intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with

the medical evidence and other evidence in the record for the reasons explained in [her]

decision." R. 22. ALJ Munday first noted that Brian's degenerative disc disease, fibromyalgia,

chronic pain, migraines, and occipital neuralgia resulted in "minimal clinical findings and

15

conservative treatment consisting almost exclusively of pain medication." R. 22–24 (citing R. 319, 338, 714–15, 733–36, 745, 751, 1009–10, 1035, 1055, 1245, 1250, 1255, 1260, 1263, 1266, 1270, 1277, 1282, 1286, 1289–90, 2876). She also noted that, after his amended alleged onset date, Brian did not receive any treatment for sleep apnea and the record contained no objective clinical findings related to that impairment. R. 24 (citing R. 271–94, 517, 521, 1316, 2636). Finally, ALJ Munday noted that Brian had "minimal clinical findings, stable exams, and mostly conservative treatment" for his mental health issues, and he declined recommended treatment. R. 24 (citing R. 1144, 1158, 1166–67, 1176, 1186–87, 1866); *see also* R. 25 (citing R. 1239–41, 1968–70, 1979–80, 1999–2000, 2010–11, 2023–24, 2033–34, 2043–45, 2055–56).

ALJ Munday gave "little" weight to Dr. Switzer's November 2014 and May 2015 opinions, Dr. Stark's June 2015 opinion, and Dr. Cardwell's December 2015 opinion because they were "vague and [did] not provide specific vocationally relevant functional limitations," and they opined on "an issue that is reserved to the Commissioner." R. 26 (citing R. 1010, 1227, 1722, 1761). The opinions also were not consistent with the objective records demonstrating minimal findings. *Id.* She gave "little weight" to the DDS psychologists' medical opinions that Brian's mental impairments were "not severe" because, although his record did not demonstrate "significant clinical findings," it did contain "evidence of a depressed mood and constricted affect, as well as one brief hospitalization, and continued psychiatric medications [being] prescribed." R. 27. ALJ Munday also gave Dr. Cardwell's June 2017 medical opinion "little" weight because it was a "checkbox form" that did not support for the significant functional limitations alleged. *Id.* Furthermore, Dr. Cardwell's opinion was not consistent with his own treatment notes showing normal mental exams except for mood and affect, Brian's mostly

16

conservative treatment, his refusal of recommended ECT treatment, and his delay in seeking psychotherapy. *Id.*

Finally, ALJ Munday gave the DDS physicians' medical opinions of Brian's physical limitations "partial" weight because they were consistent with the record as a whole, including evidence of "minimal disease in [Brian's] cervical spine" and little treatment for Brian's obstructive sleep apnea. R 28. She added functional limitations, however, to "fully address [Brian's] impairments and reported subjective symptoms of pain and fatigue, and his use of pain medications." *Id.*; *see also* R. 19–20 (limiting Brian to "only frequent handling with the right upper extremity" to accommodate his non-severe "remote history of right hand fracture").

C.    *Analysis*

Brian's arguments on appeal implicate ALJ Munday's RFC assessment. A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms.[8] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). The ALJ has broad (but not unbounded) discretion to decide whether an alleged limitation is supported by or consistent with other relevant evidence,

---

[8] "Symptoms" are the claimant's own description of his medical impairment. 20 C.F.R. § 404.928(a).

including objective evidence of the underlying medical impairment, in the claimant's record. *See*

*Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing

*Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm

the ALJ's RFC findings when it is clear that she considered all the relevant evidence under the

correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th

Cir. 2017), and she built an "accurate and logical bridge from that evidence to his conclusion[s],"

*Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (quotation marks and brackets omitted).

*See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019); *Patterson v. Comm'r of Soc.*

*Sec.*, 846 F.3d 656, 662 (4th Cir. 2017). ALJ Munday's decision meets this deferential standard.

Brian first argues that ALJ Munday improperly weighed Dr. Cardwell's and Dr.

Switzer's medical opinions and other statements about his allegedly disabling mental

impairments. Pl.'s Br. 5–9 (citing R. 1227, 1722, 1761–67). "Medical opinions" are statements

from "acceptable medical sources," such as physicians and psychologists, that reflect the

source's judgments about the nature and severity of the claimant's impairment, including his

symptoms, prognosis, functional limitations, and remaining abilities.[9] 20 C.F.R. §

404.1527(a)(1). The ALJ must adequately explain the weight afforded to every medical opinion

in the record, taking into account factors such as the nature and extent of the source's treatment

relationship with the claimant; how well the source explained or supported the opinion; the

opinion's consistency with the record as a whole; and whether the opinion pertains to the

source's area of specialty. *Id.* § 404.1527(c). Medical opinions from treating and examining

---

[9] They are distinct from medical-source opinions on issues reserved to the Commissioner, such as whether
the claimant is disabled or should not work. 20 C.F.R. §§ 404.1527(d)(1), 404.1545(a). The ALJ must
consider these opinions as she would any relevant evidence, but she need not accord any special
significance to the source's medical qualifications. *Id.* § 404.1527(d)(3); *see Morgan v. Barnhart*, 142 F.
App'x 716, 721–22 (4th Cir. 2005).

physicians typically deserve more weight than those from non-examining physicians, such as the

DDS medical reviewers. *Brown*, 873 F.3d at 268; 20 C.F.R. § 404.1527(c). Courts "must defer to

the ALJ's assignments of weight" to differing medical opinions "unless they are not supported

by substantial evidence," *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015), or they were

reached by means of an improper standard or misapplication of the law, *see Coffman*, 829 F.2d at

517.

ALJ Munday gave good reasons, supported by substantial evidence in the record, for

discounting Dr. Cardwell's and Dr. Switzer's medical and other opinions about Brian's

condition. *See Hines*, 453 F.3d at 563 n.2; *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20

C.F.R. § 404.1527(c). First, Dr. Switzer's November 2014 and May 2015 opinions and Dr.

Cardwell's December 2015 opinion merely stated in conclusory fashion that Brian was disabled.

R. 1227, 1722, 1761. This issue is reserved to the Commissioner, and an ALJ need not accord

any special significance to the source's medical qualifications when weighing such opinions. *See*

20 C.F.R. §§ 404.1527(d)(1), 404.1545(a), *Morgan*, 142 F. App'x 721–22. Furthermore, ALJ

Munday correctly pointed out that those three opinions did "not provide specific vocationally

relevant functional limitations" and were not consistent with the objective medical records, R.

26, as detailed more fully below.

ALJ Munday's reasons for discounting Dr. Cardwell's June 2017 medical opinion are

also sufficient. R. 27; *see* R. 1762–67. ALJ Munday reasoned that Dr. Cardwell's opinion was

not consistent with Brian's mostly conservative psychiatric treatment and his refusal to engage in

recommended ECT. R. 27. ALJ Munday's characterization of Brian's mental health treatment as

conservative is questionable. There is "no bright-line rule [for] what constitutes 'conservative'

versus 'radical' treatment." *Gill v. Astrue*, No. 3:11cv85, 2012 WL 3600308, at *6 (E.D. Va.

19

Aug. 21, 2012). Although medications and counseling may be appropriately considered conservative treatment for depression and anxiety, *see Kelly v. Colvin*, No. 4:13cv70, 2015 WL 3752474, at *4–5, *15–16 (W.D. Va. June 16, 2015), Brian took many combinations of medications, some of them powerful psychotropics, with little reported benefit, *see, e.g.*, R. 1151, 1158, 1177, 1187, 1196, 1206, 1216–17, 1277, 2024, 2100, 1970 (trials of Fetzima, Lamictal, Lithium, Prozac, Cymbalta, Xanax, Abilify, Wellbutrin, Effexor, Klonopin, Ativan, Adderall, and Rexulti); *compare* R. 1277, 2031, 2041, *and* 2117 (reporting that his medications helped his symptoms), *with* R. 1075, 1173, 1183, *and* 1976 (reporting that his medications did not help). *Cf. Judy T. v. Comm'r of Soc. Sec. Admin.*, No. 4:18cv28, 2019 WL 4383140, at *10 (W.D. Va. July 25, 2019) (recommending reversal and remand in part because ALJ failed to explain why he found medications including Cymbalta, Klonopin, Seroquel, Zoloft, Xanax, and Wellbutrin constituted "conservative treatment" for mental health impairments), *adopted by* 2019 WL 4345375 (W.D. Va. Sept. 12, 2019). Brian also was hospitalized once for suicidal ideation. R. 1074–77. Additionally, it was not reasonable for ALJ Munday to cite Brian's refusal of ECT as a reason to discount Dr. Cardwell's opinion. While Dr. Cardwell and Brian's other providers strongly encouraged ECT, R. 1226, 1282, 1729, 2024, 2034, 2068, 2091, ALJ Munday did not discuss *why* Brian refused to try such invasive therapy or how those reasons factored into her analysis, *see* R. 1987 ("Declines ECT feels risk do[es] not meet reward.").

   Nevertheless, ALJ Munday's other reasons provide substantial evidence to support the little weight she gave to Dr. Cardwell's opinion. Dr. Cardwell opined that Brian had significant limitations in concentrating; working independently and with others; working at a consistent pace; understanding, remembering, and carrying out simple instructions; and interacting with the public. R. 1764–65. ALJ Munday reasonably found that Dr. Cardwell's treatment notes were

inconsistent with his opinion. R. 27. Dr. Cardwell consistently noted no abnormalities in Brian's behavior, speech, thought processes, attention, concentration, thought content, cognition, and memory. *See, e.g.*, R. 1150–51, 1157–58, 1166–67, 1215–16, 1224–25, 1239–40, 1968–69, 1979, 2010, 2033–34, 2055, 2089–90, 2120–21, 2137–38, 2926–27. Brian's other providers also consistently noted normal mental exams during the relevant time. R. 1277, 1286, 1290, 1297, 1304, 1316, 1321, 2127. The medical observations and findings in these treatment notes are inconsistent with Dr. Cardwell's assessment of significant limitations. Substantial evidence also supports the ALJ's reasoning that Dr. Cardwell's opinion is not consistent with Brian's refusal of psychotherapy. Dr. Cardwell initially recommended psychotherapy in December 2014, R. 1152, and consistently recommended it at every appointment until Brian started therapy with Ms. Van Horn in June 2017, R. 2107–10; *see, e.g.*, R. 1159, 1168, 1217, 1226, 2034, 2045, 2080, 2101. Brian's refusal to seek the recommended non-invasive treatment for eighteen months supports ALJ Munday's determination that his mental impairments were not as severe as Dr. Cardwell found. Brian's other reasons for challenging the ALJ's treatment of Dr. Cardwell's opinion fare no better. The ALJ noted that Dr. Cardwell was a treating psychiatrist, R. 27, and, as shown by her recitation of the record, the ALJ considered all of the medical opinions, as well as the other evidence in the record, in assessing the weight to be given each opinion, *see* R. 19–27.

Brian next argues that ALJ Munday failed to fully account for his headaches in her RFC determination. Pl.'s Br. 30–37. ALJ Munday explained that Brian was limited to frequent exposure to extreme cold, wetness, and pulmonary irritants; occasional exposure to vibrations and hazards; exposure to moderate noise intensity level; and simple routine tasks, R. 21, to accommodate his headaches because he alleged that his headaches were triggered and exacerbated by noise, weather, odors, smoke, and mentally challenging activities, R. 379, 443,

727, 1009, 1327, 1475. Brian argues that his headaches warrant further limitations for being off task, absences, and needing to lie down in a dark room. Pl.'s Br. 35–37. Brian's argument essentially asks the Court to reweigh the evidence, which the standard of review does not permit. *Johnson*, 434 F.3d at 653.

After his alleged onset date, Brian consistently reported that he had headaches, *see, e.g.*, R. 538, 1183, 1195, 1744, 1979, 2009, 2033, 2067, 2099, 2120, 2926, but he also reported improvement in his headache symptoms and that they occurred occasionally, R. 714, 1010, 1239, 1968. He denied debilitating headaches, R. 714, 1009, or reported that they were less severe, R. 2924. His medications helped his symptoms. R. 733, 1317, 1319, 1744. Although Brian testified that his medications made him "foggy," R. 53, he consistently told providers that he had no side effects except for occasional constipation, *see* R. 714, 1010, 1310, 1315, 1319. Furthermore, except for one instance in January 2015 when he exhibited tenderness in his occipital region, R. 538, his physical exams did not demonstrate abnormal findings related to his headaches. Dr. Stark opined that his headaches were a result of his extensive opiate use, R. 715, 1056, and his providers reduced the amount of opiate medication Brian was prescribed, *see* R. 718, 1010, 1055–56. This evidence provides ample support for the ALJ's determination that Brian's headaches were not as severe as alleged and that no further accommodations were necessary.

Finally, Brian argues that the ALJ erred in assessing his credibility because she did not consider his "stellar work history." Pl.'s Br. 38–40. Brian does not challenge ALJ Munday's reasons for discounting his credibility. *See* R. 22–26. A claimant's work history is a factor that the ALJ may consider in assessing credibility, but where, as here, the ALJ provides legitimate reasons to question the severity of a person's report of symptoms, a good work history will not overcome those reasons. *Wheeler v. Colvin*, Civ. A. No. 1:13-445-RMG, 2014 WL 2157458, at

22

*15 (D.S.C. May 23, 2014); *see also Jeffries v. Astrue*, Civ. No. 3:10-cv-1405, 2012 WL 314156 at *25 (S.D. W. Va. Feb. 1, 2012) ("The requirement that the ALJ make a credibility determination based on [the objective medical findings, the evidence of record, and a claimant's testimony and conduct at the administrative hearing] would be meaningless if a long work history standing alone established 'substantial credibility.'"). "Although [Brian's] work history is commendable, it is not sufficient in and of itself to entitle [him] to "substantial credibility" given the lack of evidence corroborating [his] testimony." *Jeffries*, 2012 WL 314156, at *25. Considering the objective evidence and Brian's course of treatment, the ALJ could reasonably question the severity of his symptoms related to his pain, depression, and anxiety. Accordingly, I find that substantial evidence supports the ALJ's credibility determination.

Brian does not identify any reversible error in ALJ Munday's RFC analysis or "point to any specific piece of evidence not considered by the [ALJ] that might have changed the outcome of his disability claim." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (emphasis omitted). Instead, he urges the Court to reweigh the same exhibits and testimony that ALJ Munday considered, R. 20–26, and to conclude that the ALJ should have found him disabled by headaches, anxiety, and depression. *See generally*, Pl.'s Br. 4–40. The Court's role here is "to determine whether the ALJ's decision is supported as a matter of fact and law." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). It "cannot simply look at the same evidence and reverse the ALJ on the basis that it could have reached a different result." *Carr v. Berryhill*, No. 6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 17, 2017). ALJ Munday's decision and rationale are supported by substantial evidence and therefore the decision should be affirmed.

IV. Conclusion

23

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision, and **DIMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, Chief United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: July 13, 2020

Joel C. Hoppe
United States Magistrate Judge

24